## AFFIDAVIT OF ELLIOT RIZZO IN SUPPORT OF CRIMINAL COMPLAINT

I, Elliot Rizzo, state:

### Introduction and Affiant Background

1.      I am a Special Agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosive ("ATF") and have been so employed since 2014.  During that time, I have been involved in investigations of violations of federal firearm and controlled substance laws. Since April 2023, I have been assigned as the Group Supervisor of ATF Boston Group II. During this time, I have been responsible for the case management and development of investigations in the Greater Boston area. I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants, and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones.  I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

2.      As a Special Agent for ATF, some of my duties include conducting criminal investigations into cases of illegal possession/transfer of firearms, firearms trafficking, and drug

trafficking.   Through my training, knowledge, and experience, I have become familiar with the

habits, methods, routines, practices, and procedures commonly employed by persons engaged in the

illegal use and trafficking of firearms and controlled substances and the unlawful use or possession

of firearms.  I have been the affiant on affidavits in support of federal search warrants and arrest

warrants.  I have participated in and performed surveillance and made arrests of firearms and

narcotics traffickers who utilize their electronic devices and/or computer equipment to further their

illegal activity.  During the course of my professional experience, I have interviewed numerous

defendants, witnesses, victims, confidential informants, and other police officers regarding the

illegal use and trafficking of firearms and controlled substances and the unlawful use or possession

of firearms.  As a result of my training and experience, and information provided to me by other

law enforcement officers, I understand the various roles played by individuals or groups involved

in the trafficking of controlled substances and firearms.  I have interviewed admitted drug

traffickers, drug users, informants, cooperating defendants, and local, state, and federal law

enforcement officers regarding the way drug traffickers distribute, obtain, finance, store,

manufacture, transport, and distribute illegal drugs.  As such, I am familiar with the methods,

routines, and practices of individuals involved in the use, sale, and trafficking of narcotics,

including those involving purchasing, manufacturing, storing, and distributing controlled

substances, the collection and laundering of illegal proceeds, and the efforts of persons involved

in such activities to avoid detection by law enforcement.  I am also familiar with the terminology

and slang commonly employed by drug traffickers.  I have observed and examined numerous

types of controlled substances, and I am familiar with the packaging, pricing structure,

distribution methods, and street jargon associated with their sale and use.  I have also

encountered and become familiar with the various tools, methods, trends, and paraphernalia used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances.

3.      Based on my training and experience as an ATF Special Agent, I am familiar with federal firearms and controlled substances laws.  In this regard, I know that it is a violation of Title 21, United States Code, Section 846 to conspire to distribute and to possess with intent to distribute controlled substances.  I submit this affidavit in support of an application for a criminal complaint alleging that starting no later than on or about December 2022 and continuing to the present, Charles "Chucky" BOMMAN conspired with other persons (including, but not limited to, Jermaine Robinson and Jaquori Lyons) to distribute and to possess with intent to distribute controlled substances (including fentanyl, cocaine, and cocaine base), in violation of Title 21, United States Code, Section 846 (the "Target Offense").  As set forth below, there is probable cause to believe that BOMMAN has committed the Target Offense.

4.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other investigators and witnesses.  This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of the requested criminal complaint.  Accordingly, I have not included each and every fact known to me and other investigators involved in this investigation.

## PROBABLE CAUSE

5.      The ATF, Boston Police Department ("BPD"), Homeland Security Investigations ("HSI"), the United States Secret Service ("USSS"), the Department of Labor ("DOL"), the Internal Revenue Service ("IRS"), the Department of Agriculture ("USDA"), the Massachusetts

State Police ("MSP"), the Boston Housing Authority Police Department ("BHAPD"), and the Suffolk County Sheriff's Department ("SCSD") have been investigating a criminal organization and street gang known as the "Heath Street Gang" (a/k/a "Heath Street" a/k/a "Heath" a/k/a "Heat" a/k/a "Trottie Gang" a/k/a "Bromley" and/or "Bromley-Heath Projects") and its members and/or associates for various federal crimes.  The investigation has established that Heath Street Gang members and/or associates have been and continue to be involved in various crimes, including, trafficking in controlled substances in violation of federal law.  Pursuant to this investigation, BOMMAN has been identified as a member/associate of the Heath Street Gang, who is involved in the distribution of controlled substances.

6.      I am aware that BOMMAN has an extensive criminal history involving state convictions for several violent crimes as well as drug trafficking crimes.  These convictions include, but are not limited to: (1) convictions in 2019 for Armed Assault to Murder, Assault and Battery with a Dangerous Weapon and Assault and Battery on a Police Officer; (2) convictions in 2019 for multiple counts of Distribute/Dispense a Class B Substance; (3) convictions in 2014 for multiple counts of Assault and Battery on a Police Officer; (4) a conviction in 2012 for Assault and Battery on a Corrections Institution Guard; (5) convictions in 2012 for multiple counts of Assault and Battery on a Corrections Facility Employee; (6) a conviction in 2012 for Assault and Battery on a Corrections Institution Guard; (7) convictions in 2010 for multiple counts of Assault and Battery and Assault and Battery of a Public Employee; and (8) convictions in 2009 for multiple counts of Armed Assault to Murder.

7.      BPD officers arrested BOMMAN on state charges in June 2021.  While BOMMAN was being booked on the charges, BPD officers made certain observations.  BOMMAN bragged

about how much money he made and informed the booking officer that he was "self-employed." When an officer commented that BOMMAN lived in a community outside of Boston, BOMMAN responded: "I make too much money to live in the city.  What would I look like driving a Porsche and parking it in the projects [a reference to the Mildred Hailey Housing Development].  I make my money in the city and bring it out to the sticks."  During the booking process, when officers attempted to take a booking photo, BOMMAN made a hand sign that is consistent with the Heath Street Gang.  BOMMAN also asked if he could have the sign in his booking photo.  BOMMAN told officers that the sign "means we bodying opps" – a reference to targeting rival street gangs of the Heath Street Gang.  While making a phone call, BOMMAN told an individual to call BOMMAN's girlfriend for bail money.  BOMMAN stated that he had seven "bands" in his dresser - a "band" is a common slang term for $1,000.

8.     On or about June 2, 2022, Massachusetts State Police ("MSP") Troopers executed state search warrants pursuant to an ongoing investigation of female identified as BOMMAN's girlfriend for the distribution of fentanyl.  The search warrants were for a 2017 Porsche Macan and a residence at 20 Pond Street, Apartment # 109, in Braintree, MA.  The warrants were predicated on controlled buys of fentanyl with BOMMAN's girlfriend conducted by a Confidential Informant as well as multiple instances of MSP conducting surveillance of her engaging in what appeared to be street-level drug deals with other individuals.  BOMMAN's girlfriend was stopped by MSP Troopers in the Porsche near 20 Pond Street and advised of the search warrants.  She had two plastic baggies on her person and each baggie contained a white powdery substance in the baggies – one of the baggies had two smaller plastic baggies with suspected fentanyl in them which is consistent with street-level trafficking.  Pursuant to a later laboratory test, the substance in the

baggies tested positive for the presence of fentanyl.  The total net weigh of the fentanyl was approximately 14.8 grams.  During the stop, she stated that her boyfriend "Charlie" was at the Braintree apartment.  Troopers subsequently executed the search warrant at the Braintree apartment.  When they entered the residence, Troopers found BOMMAN inside the apartment in the living room.  Troopers thereafter located the following evidence: (1) sandwich bag boxes with loose white powder on them in the bathroom cabinet (consistent with street-level drug trafficking); (2) a digital scale with white powder residue found on it in the bathroom cabinet (digital scales are a common tool for the distribution of controlled substances); (3) multiple plastic bags of white powder in the bathroom cabinet (the substance in these bags was confirmed to contain fentanyl by a laboratory test and the total net weight was approximately 9.6 grams); (4) a bag of a blue powdery substance in the kitchen cabinet (fentanyl can be mixed with blue cutting agents and then pressed into pills as a means of counterfeiting oxycodone pills which are more expensive than fentanyl on the street); (5) a second digital scale was found in the second bathroom; and (6) documents which appeared consistent with a drug ledger.  These pieces of evidence in the Braintree apartment where BOMMAN was found are consistent with street-level drug trafficking.

9.      Separately, between February 27 and March 6, 2023, a BPD undercover officer arranged for and consummated three hand-to-hand fentanyl sales from Jermaine Robinson (a Heath Street Gang member/associate who is presently charged in this District for violating federal drug laws).  Robinson was also the subject of a state investigation for drug trafficking at approximately the same time.  Robinson was arrested on state charges and phones were seized from his person.  Robinson subsequently pled guilty to state drug trafficking charges.

10.     Federal investigators searched the phones seized from Robinson.  The phones

included numerous electronic communications between BOMMAN and Robinson in which the

two worked together to distribute fentanyl, cocaine, and cocaine base.  The communications took

place from late 2022 through approximately March 2023.  BOMMAN used two phone numbers

in the communications.  After BOMMAN changed numbers, on January 4, 2023, he texted to

Robinson: "New jack [phone number]" and "It's me chuck cuz."  The communications involved

the obtaining of controlled substances for sale (particularly fentanyl and cocaine), discussions on

pricing, discussions on the preparation of cocaine base (which is "cooked" using powder

cocaine), discussions of complaints by customers as to drug quality (including screen shots of

customer complaints), communications setting up deliveries between the two, and disputes

between the two regarding various issues associated with trafficking controlled substances.

These communications also establish that BOMMAN was supplying Robinson with fentanyl at

the time that the BPD undercover bought fentanyl from Robinson.

      11.    On December 27, 2022, Robinson texted BOMMAN: "U up I'll come to you need

the basketball I got the change" – "basketball" is common drug trafficking jargon for an eighth

of an ounce of cocaine or cocaine base.  Robinson thereafter sent another text: "If you got more

girl ["girl" is a reference to cocaine] throw me one on top of the one I'm paying for if u got it if

not it's cool I'm bout to come out brody right now" – Robinson was asking BOMMAN to front

Robinson an additional eighth of an ounce of cocaine.  BOMMAN replied: "I came to throw

this" and "Give the money for her" – BOMMAN declined to front the additional drugs.

      12.    On December 29, 2022, Robinson texted BOMMAN: "Yo oh yea imma need u to

b up n the am of tell ya shorty [girlfriend] to pull up for the $80 boy sneakers" – "boy" is

common drug slang for fentanyl.  Thus, Robinson was asking BOMMAN to have his girlfriend

deliver $80 worth of fentanyl for Robinson.  As noted above, BOMMAN's girlfriend was identified by MSP Troopers as being involved in fentanyl trafficking.  BOMMAN responded: "Ight" and "U can stop by the crib."  The two agreed to meet the following morning.  BOMMAN texted: "Bring some baking soda" and "N the am" – baking soda is used to cook cocaine into cocaine base.  Robinson texted: "Ok u want me to spin it for u or u got it" – Robinson was offering to cook the cocaine base for BOMMAN.  BOMMAN responded: "Nah I got it bro good look."

13.     On December 30, 2022, Robinson sent BOMMAN: "Yea bro it's not good they saying the one before this was Damn I gotta step my shit up n get back n rhat kitchen dogs" – Robinson's customers allegedly had complaints about the drugs that they purchased.  BOMMAN subsequently disputed that there was a problem with the quality of his drugs: "My shit gas." BOMMAN further texted: "Gizzle just bought a whole zip" – a "zip" is common drug slang for an ounce-quantity of cocaine or cocaine base.  "Gizzle" is the street name for a Heath Street Gang member/associate Jaquori Lyons.  On May 25, 2023, BPD officers executed a state warrant for an apartment at 270 Centre Street, Jamaica Plain, which was used by Lyons and his girlfriend.  This apartment overlooks the Mildred C. Hailey Apartments' grounds.  Officers recovered: (1) approximately $1,609.00 in US currency; (2) a small amount of powder fentanyl; (3) a blue fentanyl pill marked "M 30" – consistent with fentanyl pills advertised by and seized from Lyons and other Heath Street Gang members/associates; (4) a small amount of cocaine base; (5) drug trafficking paraphernalia such as mixing bowls and digital scales with drug residue on them; and (6) various rounds of ammunition, including a box of .22 caliber rounds hidden in a Oreo cookie box in the kitchen.  This evidence is consistent with Lyons being engaged in street-

level drug dealing, including cocaine.   Similarly, on December 30, BOMMAN again referenced Lyons purchasing ounces of cocaine or cocaine base from BOMMAN: "Gizzle just got a zap" and "They want another now."

14.     On January 27, 2023, BOMMAN and Robinson had a text exchange consistent with there being a problem in the quality of the powder cocaine that they received because it did not cook properly into cocaine base ("crack").  Robinson texted: "Yea bro I had to recook all that down because it wasn't dripping oil when it burnt they said n I know it's a headache but is what it is I still had twork so I just put it back in the pot."  BOMMAN responded: "O shit" and "Cuz that's the batch from yesterday huh."  Robinson replied: "Yea bro."

15.     On January 31, 2023, BOMMAN and Robinson discussed a cocaine purchase. BOMMAN texted: "Ight cool bro I'm grabbing it now bro so don't hold me up please."   He followed up: "It's a little more" and "U can give me 475."  Robinson responded: "U was supposed to been get at me so what I'll do is let u know when I'm right there n I just want the half zip bro."  Robinson also texted: "I only take out a certain amount feel me so when u said 4bucks [$400] I jumped on it but how much is it a bit more I might just give u that extra 75." The two then had an argument over the drugs.  During it, Robinson texted: "I want the 14 bro us said the 14 n yea I want it I got this garbage on me so I definitely need it bro."  BOMMAN responded: "I told u 14" and "Ima give u 15 tho."  Robinson texted: Yes 14 half zip."  BOMMAN later texted: "My man's Givin me a 31" – 31 grams is a common drug weight used in cocaine trafficking.  The two agreed to meet at a location used by Robinson.  BOMMAN asked: "Can I whip something there real quick or" – this is consistent with cooking powder cocaine into cocaine base ("crack").  Robinson responded: "Yea."  He later texted: "Bring some soda I ran

out" – baking soda is used to cook cocaine base.  On February 1, 2023, Robinson texted: BOMMAN: "N i thought I was getting extra grizzly [a gram – as noted above BOMMAN stated he would provide 15 grams rather than 14 grams] it wasn't one …"  Robinson then stated that the weight was "14.6" grams.  BOMMAN replied: "Yea it was 15.6 with the bag tho."  These communications confirm that the two met and did a deal for over 14 grams of cocaine.

16.     On February 7, 2023, BOMMAN texted Robinson: "Yo I'm bout to meet wit the Dominicans."  Robinson responded: "What they on they got some boy" – "boy" is a common drug term for fentanyl.  BOMMAN responded: "15 for 1" and "They kickin" – BOMMAN was claiming that the fentanyl was so strong that it could be heavily cut and thus they would be able to make a greater profit.  Later, Robinson texted: "Nothing on the boy?"  BOMMAN replied: "Yea" and "My man's ot" – his source was not around.  Robinson responded: "Ya girl ain't nowhere either?" – Robinson was also looking for cocaine which is referred to as "girl." BOMMAN replied: "My other man said he got a ten for one" and "No girl probably n the morning waitin on the plug" – BOMMAN had another source for high-quality fentanyl and BOMMAN was waiting to hear back from his source of supply ["plug"] for cocaine.  Robinson responded: "Ten for one? I can throw ten on one?" – confirming the alleged quality of the fentanyl and how much cutting agent to be added.  Robinson also texted: "I need that asap." BOMMAN replied: "Yea" and "6 a stick" – a "stick" is a common term for 10 grams of fentanyl and thus BOMMAN was pricing the fentanyl at $600 per 10 grams.  Robinson also asked: "They don't do half's" – 5-grams of fentanyl.  BOMMAN replied: "I can see wats up wit a half" and "They only told me the ticket on a stick."  Shortly thereafter, BOMMAN texted: "Wat u wanna do he said he'll do a half stick for 250$ just one time."  Robinson replied: "Ok cool" and "I'm

10

waiting for u."  The two had subsequent communications consistent with arranging to meet on

that day for the delivery.  BOMMAN provided the address: "N 20 pond st Braintree" – this was

the address of the prior seizure of fentanyl at the apartment used by BOMMAN and his

girlfriend.  After the two consummated the transaction, they discussed how much the fentanyl

could be cut.  BOMMAN noted: "Bro u could bring that to like a 2 sticks n be greese [good

product]" – BOMMAN was telling Robinson that he could cut the fentanyl to turn it from 5

grams to 20 grams.  Robinson replied: "I hope so because this ain't raw Brody it been hit" –

Robinson was concerned that the fentanyl was not pure ["raw"] and had already been cut.

      17.     On February 3, 2023, Robinson texted BOMMAN: "U shirt me on the fing too

bro" – Robinson was claiming that BOMMAN "shorted" him on the "fing" [a "finger" is a

common term for 10 grams of fentanyl].  BOMMAN responded: "How much was it."  Robinson

replied: "Almost 6" – he was claiming that he had been shorted approximately 4 grams of the

expected 10 grams of fentanyl.  BOMMAN responded: "This n***a gave me the two of those n

said it was ten."  BOMMAN thereafter stated: "I might rob the plug" – "plug" being a reference

to the fentanyl source of supply.  Robinson responded: "Yea he doing very bad business on

dogs."  BOMMAN also texted: "If he [referring to the drug source] don't give me my bread back

I'm tryna go see him tonight or tomorrow on dogs."

      18.     The next day, February 24, 2023, in the morning, BOMMAN texted: "He just

swore on his kids" and "That was a straight ten" – the source had confirmed that he had provided

10 grams of fentanyl.  BOMMAN also texted: Ight I no he won't bluff about four grizzly [4

grams] n that definitely ain't look like 6 come to think of it."  BOMMAN did not believe that his

source would short 4 grams of a 10-gram transaction and BOMMAN believed that the fentanyl

he provided to Robinson did not look like it was only 6 grams.  BOMMAN further texted: And u

hit me back 3 days later" – BOMMAN did not believe that Robinson would have taken 3 days to

determine that the deliver had been "shorted" by close to a half.  BOMMAN noted: "Someone

playin games."

19.     On February 24, 2023, in the evening, Robinson texted BOMMAN: "I can't b

having that garbage bro it's f***in up my name" and "Even the boy was garbage they sayin" –

Robinson was complaining about the quality of both cocaine and fentanyl ["boy"] that he

received from BOMMAN.  BOMMAN responded: "Bro U turned into a real weirdo" and "The

other day u said the boy was fire" – the fentanyl was of good quality.  Robinson responded: "The

new one u have ne was wack."  BOMMAN replied: "Now it's short n garb" and "3 days later."

BMMAN was challenging Robinson that Robinson's compliant that the fentanyl was "garbage"

was in addition to a Robinson's claim that he had been "shorted" a number of grams.

BOMMAN further noted that these problems had come after Robinson had the fentanyl for "3

days" thus implying that Robinson was trying to leverage BOMMAN with false claims about the

fentanyl delivery (which as noted above was for 10 grams).  In the exchange, Robinson texted:

"Yo bro this ain't new to me I'm not stupid the coke is weak."  BOMMAN replied: "I don't need

no one" and "I just cleared 30 racks today" – BOMMAN was arguing that he did not need to

work with Robinson and claimed that he had made $30,000 [a "rack" is common slang for

$1,000] that day.  As the two carried on their argument, BOMMAN texted: "Tryna tell me my

man shorted" and "Now it's garb."  BOMMAN was again pointing out that he did not believe

that the 10 grams of fentanyl that he had obtained from a source had been "shorted" as claimed

by Robinson or that it was poor quality but rather that Robinson was not being truthful about the

fentanyl that BOMMAN had provided him.  Robinson responded: "The soft [powder cocaine] was garb n that g [gram] of boy [fentanyl] u have me was garb not the boy [fentanyl] you gave me the other day that was short."  BOMMAN responded: "I knew the coke was garb" and "That's y I went to his crib" – BOMMAN went to the source of the cocaine to rectify that the "coke" was "garb."

20.     On March 1, 2023, BOMMAN texted Robinson: "Bro you still tryna get right" – BOMMAN was checking to see if Robinson needed controlled substances.  Robinson replied: Need to grab another 100" – this is believed to be a reference to Robinson collecting money for the drugs.  BOMMAN texted: "Ok that's cool lmk so definitely grab it tho right."  Robinson replied: "Bro" and "A few gs raw" – Robinson was seeking uncut fentanyl.  BOMMAN subsequently responded: "I'll try to get the 5" – half of a "finger" or "stick" of fentanyl. BOMMAN then texted: "Bro 300$ the hall stick of raw" – BOMMAN could obtain 5 grams of uncut fentanyl for $300.  The two then exchanged communications in which Robinson stated he was going to sleep because he was not feeling well.  Robinson later texted: "I'm up bro my fault really had to rest but I'm up n I'll grab that 5piece" – referring to the 5 grams of fentanyl.  Based on subsequent communications, the deal did not go through smoothly.

21.     On March 2, 2023, BOMMAN texted: "All u gotta do is b on point u either want something or u don't n***az is real trappers [drug dealers] u no we get aggravated quick I no u haven't Ben around but we trappers first" – BOOMAN was complaining about Robinson's professionalism in their drug dealing activities.  BOMMAN then confirmed that he had obtained the fentanyl for Robinson.  The two thereafter had communications about the delivery of the 5 grams of fentanyl.  A few hours after the transaction, BOMMAN texted: "Bro that shit was fire."

Robinson responded: "Fire but I didn't put anything on it" – Robinson did not cut the fentanyl.

BOMMAN replied: "Dam bro u can't give it to them like that."

22.    On March 3, 2023, Robinson texted BOMMAN: "Sup with the homework gang"

– he was seeking to be resupplied by BOMMAN.  BOMMAN responded: "Wat u was tryna do?"

Robinson replied: "Same thing" – 5 grams of fentanyl.  BOMMAN responded: "He ain't gonna

do halfs I don't think" – BOMMAN did not believe that his supplier would do less than 10-gram

quantities of fentanyl.

## CONCLUSION

23.    Given the above facts, there is probable cause to believe that Charles BOMMAN

conspired to distribute and to possess with intent to distribute controlled substances in violation

of Title 21, United States Code, Section 846.

Special Agent Elliot Rizzo
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me telephonically in accordance with the requirements of
Federal Rule of Criminal Procedure 4.1 on February 13, 2024.

HON. DONALD L. CABELL
CHIEF UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

14